*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. M. BROWN, Minor.

FOR PUBLICATION
October 02, 2025
10:04 AM

No. 371986
Wayne Circuit Court
Family Division
LC No. 2020-001013-NA

Before: GARRETT, P.J., and K. F. KELLY and SWARTZLE, JJ.

SWARTZLE, J.

Respondent-mother's behavior with respect to reunification with her young child, KMB, was not perfect, but it was generally positive. Rather than her behavior, the record makes clear that it was respondent-mother's housing that served as the primary stumbling block for reunification. Specifically, throughout most of the proceedings, respondent-mother lived in an extended stay motel room with the father of KMB. The petitioner admitted that the room was safe and appropriate for respondents and KMB to have unsupervised visits, but the petitioner asserted that the room was too small for KMB to live there.

Being "too small"—without more—is not sufficient here. At no point did the petitioner explain the minimum size of housing needed for respondent-mother to retain her parental rights to KMB. Although we have little doubt that the housing was not ideal, ideal is not the standard. The housing was deemed to be safe and appropriate, and even if a bit cramped, the record is devoid of evidence suggesting that the housing could not accommodate a small child. As we explain, the trial court clearly erred in finding statutory grounds for terminating respondent-mother's parental rights to KMB.

## I. BACKGROUND

### A. PETITION

The Michigan Department of Health and Human Services (DHHS) filed a petition in December 2020 to remove KMB from respondent-mother and terminate her parental rights. The DHHS alleged that KMB had tested positive for marijuana at birth in September 2020, and

respondent-mother reported a history of heroin addiction, although she had been clean for over three years. The DHHS alleged that, in October 2020, respondents were intoxicated, and respondent-mother stabbed respondent-father[1] in the hand. Back in 2015, respondent-mother's parental rights had been terminated to another child. At the time of this petition, respondent-mother was married, but that individual was not the father of KMB.

The trial court removed KMB from respondent-mother's care. In May 2021, respondent-mother pleaded no contest to allegations in the petition, and the trial court took jurisdiction over KMB. After respondent-father established paternity, the DHHS filed a supplemental petition to seek jurisdiction over him, and respondent-father pleaded to allegations in the petition.

Following an August 2021 dispositional hearing, the trial court ordered respondent-mother to obtain and maintain suitable housing and income; complete a psychological examination; participate in parenting classes; maintain communication with agency personnel; engage in visitation; participate in individual therapy with an anger-management or domestic-violence component; complete a substance-use assessment; and complete random-drug screenings. The trial court further granted the DHHS with discretion to allow unsupervised visits between respondent-mother and KMB.

## B. EFFORTS TO REUNIFY

The record demonstrates that, in the following months, respondent-mother was employed and maintained contact with her foster-care worker. A February 2022 report indicates that respondent-mother had completed and benefited from parenting classes. Respondent-mother was partially in compliance with visitation, therapy, and housing. Although she was only partially compliant with drug screenings, her work schedule prevented her from getting to the screening facility before that facility closed. The screenings that respondent-mother had completed were positive only for tetrahydrocannabinol (THC). According to Christina Albany, a foster-care worker, respondent-mother's marijuana use did not negatively impact her parenting ability.

Throughout the proceedings, the department identified housing as the main concern related to respondent-mother's compliance with the case-service plan. During a January 2023 review hearing, for example, Albany testified that respondent-mother was complying with the case-service plan, but housing remained "one of the biggest barriers" to reunification. Respondents were first living in respondent-father's mother's home, which had safety issues. They moved into an extended-stay motel, which the department identified as being safe and appropriate for unsupervised visits, but not appropriate for overnight visits or reunification because of its small size.

Respondent-mother was loving and affectionate toward KMB during visits, and respondent-mother and KMB were bonded. While her attendance was not perfect, respondent-mother consistently participated in visits with KMB, including unsupervised ones. With regard to respondent-mother's progress with the service plan, a January 2023 report made the following findings:

---

[1] Respondent-father is not a party to this appeal, nor any pending appeal, although the trial court also terminated his parental rights to KMB.

- Participate and benefit from parenting classes: *Completed and benefited*

- Participate and benefit from individual therapy: *Compliant*

- Participate and benefit from random drug screening: *Partially compliant*

- Obtain safe and suitable housing: *Not compliant*

- Provide a legal source of income: *Compliant*

- Attend all court proceedings: *Partially Compliant*

- Maintain contact with the worker: *Compliant*

- Participate in parenting times as scheduled: *Compliant*

- Resolve legal issues: *Compliant*

- Participate in psychological evaluation: *Completed*

- Substance abuse assessment: *Compliant*

Thus, the only "Not compliant" item was housing. As for therapy, the report noted that respondent-mother's therapist had recommended ending services because respondent-mother had met her goals, and the therapist was not concerned about future domestic violence or relapse.

During an April 2023 hearing, the referee noted that respondents "were planning together," but they were still living in the motel room that was purportedly not suitable for KMB. The referee observed that respondents "were otherwise compliant with the parent agency agreement." Respondent-mother remained employed, and respondents continued to have unsupervised visits with KMB.

In tension with the overall positive progress made by respondent-mother, Albany requested during that same hearing that visits be supervised, and she explained that the department was going to file a supplemental petition seeking termination because respondents did not have suitable housing and were not consistently taking drug screenings. Albany stated that the motel was "suitable to bring a child to, but not for like an overnight visit" because of its small size. Further, there was an allegation of a domestic-violence incident between respondents, though KMB was not present, and police were not involved.

The trial court ordered that KMB's visits be supervised and changed the permanency plan to adoption based on the extended-stay motel being too small, the "recent incident of domestic violence," respondent-father testing positive for cocaine, and the length of time since removal. Albany subsequently filed a petition seeking termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

## C. STATUTORY GROUNDS

The trial court began termination proceedings in February 2024. Albany testified that respondent-mother completed parenting classes, but her participation in visits with KMB was "sporadic," attending approximately 73% offered parenting-time sessions. Albany testified, "At times [respondents] would attend the visit[s] consistently, say for two weeks, and then I wouldn't hear from them for another two weeks." Respondent-mother's visits with KMB did, however, go well, and KMB enjoyed seeing her. Respondents would often provide food, toys, and clothing items during the visits. Albany opined, however, that during some visits, respondents did not appear "fully prepared and ready to engage with [KMB]" and would sometimes get into disagreements with each other, resulting in KMB appearing uncomfortable and acting out.

As to housing, Albany asserted that the motel room in which respondents lived was safe and appropriate for unsupervised visits, but it was not appropriate for reunification because of its relatively small size. She had provided some housing resources to respondents and offered to help them with the application process. Respondent-mother had stated that she did not have money for a security deposit. The DHHS could not provide upfront funding for application fees, but it could offer reimbursement. Respondents had previously reported finding alternative housing, but they did not move or follow up with the resources that Albany provided. Respondent-mother had maintained employment throughout the case.

Albany testified that respondent-mother participated in therapy, but Albany had received "multiple, early termination notices because [respondent-mother] was not maintaining that contact with her assigned therapist." When Albany informed respondent-mother about the noncompliance, respondent-mother would contact the therapist. Respondent-mother's therapist reported that she was not concerned about respondent-mother relapsing, but she was concerned about respondent-mother's relationship with respondent-father. Albany and respondent-mother had discussed the impact that respondent-mother maintaining a relationship with respondent-father could have on her reunification efforts because he was not complying with his case-service plan. Albany did not think that respondent-mother benefited from counseling on domestic violence because respondent-father had reported that respondent-mother slapped him in April 2023 and police had responded to the motel room in February 2023 for an alleged incident. Albany believed that there was "mutual domestic violence" between respondents because respondent-father had been aggressive toward respondent-mother, and there were two occasions on which respondent-mother had a black eye, which respondent-mother had explained being caused by a work incident.

Albany talked with respondent-mother about her noncompliance with some of the substance screenings, and respondent-mother told her that she could not get to the testing site in time because of work. Albany asked respondent-mother to provide her with documentation showing that she was working, but respondent-mother provided only one letter during the case stating that she was at work at the time of screening. Albany also told respondent-mother to call her if respondent-mother was working when she was supposed to screen, and Albany would try to test her at work. Respondent-mother called Albany one time about conducting a test at work. Although she missed several appointments, respondent-mother did not exhibit behaviors indicative of active substance use, and Albany did not have current safety concerns as to substance abuse "so long as [respondent-mother] did not go back to using other substances and somehow continue[s] to maintain her sobriety." For her part, respondent-mother submitted 15 unscheduled drug screenings, none of which showed a positive test for a substance of concern.

Nicole St. Aubin, a foster-care supervisor, testified that respondent-mother told her in January 2024 that she planned to move into a new residence the next month. St. Aubin scheduled a home assessment, but respondent-mother did not show up at the residence or respond to St. Aubin's attempts to contact her. Respondent-mother had been terminated from counseling in February 2024 for failure to attend, even after the therapist had rescheduled the appointment to accommodate respondent-mother's schedule.

Respondent-mother testified in opposition to termination. She maintained that she had a strong bond with KMB. With respect to screening, she had asked Albany to test her at work, but Albany would not, and the department had not provided an option closer to her work. Addressing the alleged April 2023 incident, respondent-mother denied slapping respondent-father; she said the contact was accidental. Throughout the proceedings, respondent-mother had been jointly planning with respondent-father, and at no point had the DHHS or trial court made separation from respondent-father a condition of respondent-mother's reunification with KMB. With that said, had she been told to leave respondent-father, she would have done so for KMB's sake.

On housing, respondent-mother explained that she was trying to move into a new residence, but she was waiting for some repairs to be completed. She could afford the residence without respondent-father because it was cheaper than the motel room, for which she was paying $250 per week. Respondent-mother disputed that the department had been much help at all in finding a new residence; she had contacted the services that the department had suggested, but none of them panned out. As for the motel room itself, if respondent-mother were permitted to take home KMB that day, she could care for him, including putting a toddler bed in the motel room. Respondent-mother had a refrigerator and could cook meals, and she had toys and clothes already for KMB.

The trial court reconvened in March 2024 to continue addressing statutory grounds. St. Aubin testified again, explaining that respondent-mother contacted her a few days earlier to set up a home assessment. When St. Aubin went to the residence, respondent-mother was not there and did not respond to St. Aubin's calls. Respondent-mother had not provided the DHHS with any documentation demonstrating that she was moving into the residence. Since the previous hearing, respondent-mother had maintained only sporadic contact with the department.

Respondent-mother testified that she did not tell St. Aubin about the delay in the residence being ready because she hoped it would be completed by the time of the assessment. She did not contact the DHHS about missed parenting-time sessions because they were already considered as a no-show, and she did not think that contacting the department would make a difference.

The trial court found that there was clear-and-convincing evidence to support the termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). The trial court explained that KMB had been removed from respondent-mother almost three years earlier. Domestic violence was one of the bases for jurisdiction, but respondents were "still spending a fair amount of time together" and there was tension between them during visits with KMB. The trial court noted that "housing [was] a substantial issue." The trial court found that three years was "a long time for a child to be languishing in foster care."

## D. BEST INTERESTS

In April 2024, the trial court held a best-interest hearing, which respondents did not attend. St. Aubin testified that respondent-mother had tested positive for cocaine and marijuana since the previous hearing. Respondent-mother had been terminated from substance-use counseling due to her lack of participation, and she had participated in three out of seven parenting-time visits. St. Aubin had not been able to reach respondent-mother for several weeks, and she had not provided any updates about housing. Respondent-mother's interactions with KMB were appropriate, and they were affectionate with each other.

KMB was in a licensed nonrelative foster-care home. The department had sent an Interstate Compact on the Placement of Children request to assess KMB's maternal grandmother, who lived in Ohio. KMB was doing well in his placement and was bonded with his foster parents. The foster parents wanted KMB to be adopted by his grandmother, but they would consider adopting him if that was not possible. St. Aubin opined that adoption was in KMB's best interests, rather than guardianship, so that the child could have consistency and stability. St. Aubin also believed that termination was in KMB's best interests due to the length of time that the child had been in care and the need for permanency in a home "free of substances and domestic violence."

Kathryn Wolak, a foster-care worker, testified that respondent-mother wanted KMB to be placed with his maternal grandmother if she lost her rights to him. Respondent-mother had reported to her in March 2024 that the residence was being worked on, and she was going to look elsewhere for housing if it was not ready in the following two weeks. Wolak had received no update since then about housing. During one visit that Wolak observed, respondents argued, respondent-father got "flustered," and he left.

The trial court found that termination was in KMB's best interests, noting respondent-mother's positive drug screens since the previous hearing and no change in her housing. The trial court acknowledged that KMB might refer to respondent-mother as his mother, but the case depended on "the parents making strides towards actually being able to actually parent the child or not and here they're just not." Instead, "nothing significant really has changed" during the three-year case, and KMB was entitled to permanency and stability. The trial court found that reasonable efforts had been made and entered an order terminating respondents' parental rights to KMB.

Respondent-mother now appeals.

## II. ANALYSIS

### A. STANDARD OF REVIEW

On appeal, respondent-mother argues that the trial court clearly erred by determining that termination was proper under MCL 712A.19b(3)(c)(*i*), (g), and (j). "To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). We review for clear error a trial court's findings regarding statutory grounds. *Id*. "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

## B. STATUTORY GROUNDS FOR TERMINATION

As noted earlier, the trial court found that there was clear-and-convincing evidence to support termination of respondent-mother's parental rights under MCL 712A.19b(c)(*i*), (g), and (j). Beginning with (c)(*i*), a trial court may terminate parental rights under this subsection if 182 days or more have elapsed since the trial court entered the initial dispositional order and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Termination may be proper under this ground when "the totality of the evidence amply supports" a finding that the parent has not achieved "any meaningful change in the conditions existing by the time of the adjudication." *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

It is undisputed that more than 182 days elapsed from the issuance of the initial dispositional order in September 2021 to the termination proceedings in March 2024. The trial court originally assumed jurisdiction over respondent-mother because of domestic violence, substance use, and improper supervision. Although the trial court ordered respondent-mother to obtain and maintain suitable housing, housing was not a basis for the trial court taking initial jurisdiction over respondent-mother.

Throughout the case, respondent-mother participated in services, including parenting classes and therapy, as well as most of her visitations with KMB, including unsupervised visitations. As to the domestic-violence concern, respondent-father alleged that respondent-mother slapped him in April 2023, which respondent-mother denied, and there is brief mention in the record of police responding to the motel in February 2023. KMB was not present for these incidents. Albany and St. Aubin testified about concerns that there was "mutual domestic violence," noting respondent-father's aggression during visits, and respondent-mother having a black eye. Respondent-mother's counselor had concerns about respondent-mother's relationship with respondent-father, but at the same time, she recommended ending counseling because she was not concerned with respondent-mother relapsing or engaging in domestic violence.

Albany spoke with respondent-mother about the impact that respondent-father was having on her reunification efforts, and respondent-mother acknowledged that he was potentially impeding her reunification efforts. The trial court did not, however, order separation of, or no contact between, respondents. Instead, throughout most of the proceedings, the parties were working toward reunifying KMB with both respondents, with the trial court's acknowledgment. At no point was respondent-mother ordered to separate from respondent-father as a condition of her reunification. And as for any domestic abuse against respondent-mother, such incidents alone are not proper grounds for termination. *In re Plump*, 294 Mich App 270, 273; 817 NW2d 119 (2011). Although a new incident of domestic violence by respondent-mother could warrant a change of plan, there is not clear-and-convincing evidence on this record that there was ongoing violence that warranted termination, particularly when KMB was not present during the April 2023 incident.

Regarding the substance-abuse concern, at the time that the trial court made its statutory-grounds findings, respondent-mother had only tested positive for THC, a now-legal substance under Michigan law. *Yellow Tail Ventures, Inc v City of Berkley*, 344 Mich App 689, 694; 1 NW3d 860 (2022). Although respondent-mother had missed some of her random-drug screenings because the testing times conflicted with her employment, Albany testified that she did not have

concerns that respondent-mother was using other substances or that the marijuana use was impacting her parenting. Respondent-mother's positive screen for cocaine *after* the statutory-grounds determination is not particularly relevant when reviewing whether that determination itself was supported by sufficient evidence. Accordingly, the trial court clearly erred by finding that there were grounds to terminate respondent-mother's parental rights under MCL 712A.19b(3)(c)(*i*).[2]

Turning to MCL 712A.19b(3)(g), a ground for termination exists if "[t]he parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." The trial court did not articulate any ground or analysis for terminating respondent-mother's parental rights under MCL 712A.19b(3)(g), and for this reason alone, the trial court committed clear error with respect to this subsection.

Finally, under MCL 712A.19b(3)(j), a trial court may terminate parental rights if it finds by clear-and-convincing evidence that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." MCL 712A.19b(3)(j). Termination is proper under this subsection when there is a demonstrated potential for physical or emotional harm to the child. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011). "[A] parent's failure to comply with the terms and conditions of his or her service plan is evidence that the child will be harmed if returned to the parent's home." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

The trial court's findings are not particularly clear on the reasonable likelihood of harm to KMB. The trial court repeatedly identified housing as a barrier for reunification, and the record confirms that housing was a—if not *the*—trial court's primary justification for termination. But there is little in the record explaining precisely why the motel room was inadequate. The DHHS found the living space to be generally safe and appropriate for the parents' unsupervised visits with KMB. With respect to living there, however, the DHHS deemed the space too small for KMB. But other than a bare assertion, the DHHS did not actually demonstrate in the proceedings below or on appeal that the size of the motel room alone justified removal. Respondent-mother provided unrebutted testimony that she had sufficient space for a toddler bed, she could cook meals, and she had toys and clothing for KMB. On this record, it is unclear why the extended-stay motel room was not appropriate, even if the room size might not have been ideal.

On other aspects of her service plan, respondent-mother's participation was not always consistent, but it was generally positive. Although it is appropriate for a trial court to consider a parent's participation in the plan, and respondent-mother needed to show that she had benefitted, see *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012), perfection has never been the standard. Even if respondent-mother was a "less-than-ideal parent," *In re Rood*, 483 Mich 73, 76;

---

[2] The petition also sought termination under MCL 712A.19b(3)(c)(*ii*), although petitioner did not address this ground at the termination hearings, nor did the trial court rely on this subsection for its findings.

763 NW2d 587 (2009), the DHHS needed to establish a reasonable likelihood of harm if KMB were to be returned to respondent-mother's care, MCL 712A.19b(3)(j).

Respondent-mother engaged in therapy and parenting classes, and she had many positive, unsupervised visits with KMB. Other than tests she missed because of her employment, respondent-mother did not test positive for any substance of concern at the statutory-grounds stage. As for any domestic abuse, as already explained, the record does not show that there was a reasonable likelihood of harm to KMB. The new allegation of domestic violence related to respondent-father reporting that respondent-mother slapped him, for which KMB was not present, and which respondent-mother denied. This incident does not clearly establish a reasonable likelihood of harm to KMB, especially in the context of positive reports about respondent-mother's visitations and interactions with KMB, and positive reports from respondent-mother's therapist throughout the proceedings.

For these reasons, the trial court clearly erred in finding that statutory grounds existed for termination of respondent-mother's parental rights to KMB under MCL 712A.19b(c)(*i*), (g), or (j). There was not clear-and-convincing evidence to support any of the three identified grounds. Because a statutory ground is a necessary condition for termination of parental rights, we need not consider respondent-mother's alternative arguments on reasonable efforts or best interests.

### III. CONCLUSION

To sum up—respondent-mother did not show perfect adherence to her service plan, but she did show consistent benefit from that plan. A fair reading of the record confirms that housing was the primary concern throughout the proceedings, and as we have explained, the department must show more in terms of deficiency beyond the bare assertion of inadequate size of the living space. For example, does the small size preclude adequate feeding, sleeping, playing, or other aspects of a healthy childhood? The record shows none of this. Thus, for the reasons set forth in this opinion, the trial court's order of termination is vacated, and the matter is remanded to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Kristina Robinson Garrett